## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| 25 WESTERN AVENUE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 22 C 2697 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| LESTER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

The plaintiff has filed a motion to compel discovery responses from defendants, Eric Lester, Warren Forsythe, Re No. One, LLC, and StarCorp, LLC. For the following reasons, the motion [Dkt. #107] is granted.

This case is about a transaction to set up a Hardee's fast food franchise in Oswego, Illinois. It was, to say the least, no simple deal. Quite the contrary. It was multi-partied and multi-layered and exceedingly complex transaction – one that was a good deal more complex than that which one might expect when it comes to selling hamburgers. Going by the plaintiff's allegations, as we must at this point, the property involved was first purchased by JC123 Holdings (owned by Jason and Carl LeVecke) for $800,000. [Dkt. #45, Par. 33]. JC123 (the LeVeckes) transferred the property to Hardee's Holdings Oswego (owned by Parviz Donboli, the LeVecke's broker) for an unknown sum. [Dkt. #45, Par. 33]. Hardee's Holdings Oswego (Donboli) then sold it defendant RNO (owned by defendant Eric Lester, defendant Warren Forsyth as CFO), again for an unknown sum. [Dkt. #45, Par. 33].

It was somewhere between Hardee's Holdings Oswego (Donboli) and defendant RNO (Lester, and Forsyth) that Connie and Mike Markovich, who invest through their LLC, plaintiff 25 Western, came along looking for a commercial property investment to provide them with income in their retirement. [Dkt.#45, Par. 33]. In January 2018, their broker, Dalton Barnes of Matthews Real Estate Investment Services – which also served as RNO and StarCorp's broker [Dkt. #45, Par. 35] – made them the following pitch, which came straight from RNO, Lester, StarCorp (like RNO, owned by defendant Eric Lester, defendant Warren Forsyth as CFO), and Forsythe:

> the property was operated by StarCorp (Lester and Forsyth) which successfully operated 145 Hardee's restaurant franchises and StarCorp was under contract to purchase the property and was offering to sell the property. As part of the deal, StarCorp (Lester and Forsyth) would lease back the property in a 20-year triple-net lease backed by a corporate guarantee from StarCorp with a $1,600,000 purchase price based upon a 6% capitalization rate of annual rent to be set at approximately $94,400.

[Dkt. #45, Pars. 36, 38]. 25 Western (the Markovichs) relied on Barnes/Matthews Real Estate Investment Services that the property was indeed worth the requested purchase price of $1,600,000. [Dkt. #45, Par. 39].

On February 20, 2018, RNO (Lester and Forsyth) – not StarCorp (Lester and Forsyth) – and 25 Western executed an Agreement for Purchase and Sale of Commercial Property ("Purchase Agreement") whereby 25 Western (the Markovichs) agreed to purchase the Property from RNO for $1,600,000 [Dkt. #45, Par. 41]. According to the Complaint, the Purchase Agreement indicated that RNO – not StarCorp – would be entering into the 20-year triple-net lease. [Dkt. #45, Pars. 42-43]. But the Complaint also states that the defendants planned on having StarCorp enter into the lease instead of RNO, which was the original pitch from Barnes/Matthews Real Estate Investment Services. [Dkt. #45, Par. 44]. The lease between StarCorp and 25 Western was signed on March

9, 2018. So we go from StarCorp supposedly being the one to lease the property and run the Hardee's, to RNO supposedly being the one to lease the property and run the Hardee's, back to StarCorp actually being the one to lease the property and run the Hardee's. There should be a picture of this case in the dictionary next to the entry for "convoluted."

StarCorp, as it turns out, was what can only be termed a "mess," losing at least $8,000,000 annually and unable to make its payments under the lease. [Dkt. #45, Pars. 46]. On or about May 2019, StarCorp having vacated the Property in March 2019, sublet it to a hoagie shop without notifying or obtaining the consent of 25 Western. [Dkt. #45, Par. 53]. 25 Western (the Markoviches) apparently didn't find out until seven months later, on December 6, 2019, when StarCorp notified 25 Western that it "unfortunately had to close our Hardee's . . . We were however able to find another local tenant to lease the property from us while we continue to pay our rent to you. . . . I'm attaching the sub-lease for your records and to make sure there are no concerns regarding it before the lease commences." [Dkt. #45, Par. 54].

Then came 2020. In March, StarCorp notified 25 Western that StarCorp would not pay rent for April, May, and June of 2020 due to its financial decline as a result of the COVID-19 pandemic, which was barely underway. [Dkt. #45, ¶ 57-58]. On or about July 3, 2020, 25 Western provided notice to StarCorp that StarCorp was in default on the Lease for failing to pay rent. [Dkt. #45, Par. 58]. In December 2020, StarCorp offered to pay 25 Western $238,000, which would come from a loan from Lester, in exchange for terminating the Lease. If 25 Western didn't accept the offer, StarCorp said it would file for bankruptcy, and the Lease would be rejected. [Dkt. #45, Par. 58].

On March 3, 2021, 25 Western filed an eviction complaint in the Kendall County, Illinois Circuit Court to obtain possession of the property, past due rent, and rent due through the date of

judgment. That proceeding is still dragging on. [Dkt. #45, Par. 60]. In August 2021, 25 Western discovered that the current value of the Property was approximately half of what 25 Western was induced to pay, [Dkt. #45, Par. 61], and this suit followed. Now we have the inevitable discovery dispute. 25 Western served first sets of Requests for Production and interrogatories on defendants, Lester, Forsythe, RNO, and StarCorp (the Lester Defendants), on March 16, 2023. As the Lester Defendants concede [Dkt. #70, Par. 4], that meant responses and/or objections were due on April 17, 2023. Fed. R. Civ. P. 33(b)(2); Fed. R. Civ. P. 34(b)(2)(A). But nothing came from the Lester Defendants. Two weeks later, on May 5, 2023, 25 Western notified the Lester Defendants that their responses to the discovery were overdue. It was another two weeks before the Lester Defendants responded with, essentially, the same paragraph of objections to each of the requests now at issue here. (RFP Nos. 8-10, 11-14, 15, 30-31, Interrogs Nos. 8-9). [Dkt. #107-2, at Pages 248-352, 361-71].

Under Fed.R.Civ.P. 33(b)(2), the responding party must serve its answers and any objections within 30 days after being served with the interrogatories. In the event of an objection, "[t]he grounds for objecting to an interrogatory must be stated with specificity. Any ground not stated in a timely objection is waived unless the court, for good cause, excuses the failure." Fed.R.Civ.P. 33(b)(4). Similarly, under Fed.R.Civ.P. 34(b)(2)(A), responses are due in writing within 30 days after being served. Any objections must state whether any responsive materials are being withheld on the basis of that objection. And, again, failure to meet the deadline can result in a waiver of any objections. *See, e.g., Poulos v. Naas Foods, Inc*., 959 F.2d 69, 74 (7th Cir. 1992)("Of course, [plaintiff] had probably already waived any objection to production by failing to object when disclosure was due."); *Nat'l Van Lines v. First Nat'l Van Lines, Inc*., No. 22 C 4558, 2023 WL

3602803, at *2 (N.D. Ill. May 23, 2023); *AAEON Elecs., Inc. v. NEC Display Sols. of Am., Inc.*, No. 21 C 4397, 2022 WL 13976377, at *3 (N.D. Ill. Apr. 19, 2022); *Boyd v. Lazer Spot, Inc.*, No. 19 C 8173, 2022 WL 2865916, at *2 (N.D. Ill. Mar. 30, 2022); *Stagger v. Experian Info. Sols., Inc.*, No. 21 C 2001, 2021 WL 5299791, at *4 (N.D. Ill. Nov. 15, 2021)("While Rule 34 does not contain express waiver language regarding untimely objections, district courts in the Seventh Circuit [and elsewhere] have interpreted Rule 34 as containing an implicit waiver provision to parallel Rule 33(b)(4)").

The Lester Defendants argue that their objections were not waved because there was "good cause" for their failure to lodge them on time. It has to be noted here that their response brief, which was due on December 28, 2023 [Dkt. #108], was ultimately filed a day late. The Lester Defendants had filed a response on December 28th, but had badly mischaracterized an email exchange between the parties and cast some rather serious aspersions on opposing counsel. [Dkt. #11, at 9 ("Apparently, Plaintiff's counsel does not consider a death in the family a legitimate excuse for delays in responding to discovery requests. Nor does Plaintiff's counsel consider his own consent to an extension a legitimate excuse."); *compare* Dkt #107-2, Page 229-30/526 ("I'm sorry for your loss. Your request for an extension of *the opposition due date* is granted.")]. It's fortunate they caught their error, for it would have cast them in a bad light. But, they still needed to seek leave to file an amended response, especially for one that came in after the deadline. The Lester Defendants opposition to the plaintiff's motion to compel was off to a bad start.

In their amended response, the Lester Defendants explain that, on April 14, 2023, three days before their responses were due, they filed a motion to stay discovery. [Dkt. #70]. But that motion was denied five days later on April 19, 2023. At best – and it's a stretch – one could argue that the

Lester Defendants might be given the five days between the day they filed their motion and the day the court denied the motion tacked onto the April 17th deadline. But even if that were the case, they still would have missed that end of that grace period by a month.

Backpedaling, the Lester Defendants next complain that when the court denied their motion to stay, "the Court did not set a deadline for the [Lester] Defendants to submit discovery responses and objections." [Dkt. #113, at 9]. Courts rarely engage in scheduling deadlines for responding to sets of discovery requests because, of course, those deadlines are already set in the Federal Rules of Civil Procedure. More to the point, the Lester Defendant never asked the court to extend the deadlines for their responses, so the schedule provided by the Rules governed.

Backpedaling further, the Lester Defendants next point the finger of blame for their tardiness at the plaintiff. They complain that on the day their motion to stay was denied the plaintiff failed to demand immediate responses and did not make a fuss over it while the parties were discussing settlement conference dates. So, from the Lester Defendants' tacit perspective, deadlines set by the Federal Rules of Civil Procedure are only effective when accompanied by some amount of nagging. That's nonsense, of course, but the proposition, although wisely not articulated, is at the core of the argument. For, if accepted, it would effectively negate certain of the timetables established by the Federal Rules of Civil Procedure.

The Lester Defendant then, finally, backpedal over the cliff of waiver:

It was not until weeks after the Court's denial of the Motion to Stay that 25 Western's counsel emailed counsel for the [Lester] Defendants claiming, "we were expecting your clients' responses to 25 Western's discovery requests on April 19." In response, counsel for the [Lester] Defendants sought an extension of time to May 17 to respond to 25 Western's discovery requests, and 25 Western's counsel had no objection. The [Lester] Defendants then served their discovery responses on May 17.

[Dkt. #113, at 9-10]. The first email the Lester Defendants refer to came on May 5th, slightly more than two weeks after the court's denial of the motion to stay. So, "weeks after" is technically accurate, but quite misleading for in common parlance it would be taken to mean a longer period than actually expired.

By May 9th, the Lester Defendants had not offered any response to plaintiff's inquiry about the long overdue discovery responses, so the plaintiff wrote again: "I have not received a response to my email below regarding your clients' responses to 25 Western's discovery requests, which were due on April 19." [Dkt. #107-2, Page 221/526]. That is an email the Lester Defendants conveniently ignore in their response brief. The Lester Defendants did finally ask for an extension to May 19th and, as they concede, plaintiff agreed.

But, the Lester Defendants do not accurately represent the email exchange. The plaintiff made it plain that the extension was for *answers and documents*, not *objections*. [Dkt. #107-2, Page 219/526 ("Regarding 25 Western's discovery propounded in March, we will refrain going to the court regarding this issue before May 17, but we're expecting to see the Lester Defendants' responses without objections on that date.")]. That's completely understandable. Why allow your opponents an extension for discovery responses only to have them use the time to paste a catalog of objections as to each request in their "response."

So, what the Lester Defendants call "good cause" turns out to be a collection of blame, deflections, exaggerations and misrepresentations. The broad discretion courts have in resolving discovery disputes should not be – and will not in this case be – exercised in support of those sorts of arguments. As such, the Lester Defendants' objections are deemed waived and the plaintiff's motion is granted as to Requests for Production Nos. 8-10, 11-14, 15, 30-31, and Interrogatories Nos.

8-9.

That leaves Requests for Production 53-58, which plaintiff served on the Lester Defendants on October 12, 2023, meaning responses were due by November 13, 2023. This time the Lester Defendants' objections were a week late. The excuse offered was that ten days before the Lester Defendants' responses were due, the court set a settlement conference date of December 4th. The Lester Defendants say they *assumed* they were relieved of their discovery obligations during the period while they were "dedicating substantial time and resources towards preparing for the December 4 settlement conference" and during which the parties were exchanging settlement offers. [Dkt. #113, at 10]. That argument, to say the least, and viewed even in a light most favorable to the defendants, is not persuasive.

In law, perhaps even more than in life generally, it is risky to assume things and to predicate behavior based on assumptions. Lawyers make fine livings as a result of people wrongly assuming things. Moreover, the Lester Defendants' "substantial time" assertion is just that: an unsupported assertion. *See, e.g., United States v. Stevens*, 500 F.3d 625, 628-29 (7th Cir. 2007)("[A]rguments in a ... brief, unsupported by documentary evidence, are not evidence."); *Campania Mgmt. Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 853 (7th Cir. 2002) ("[I]t is universally known that statements of attorneys are not evidence."); *Lee v. Chicago Youth Centers*, 69 F. Supp. 3d 885, 888 (N.D. Ill. 2014) (collecting cases) ("[I]t is basic that unsupported statements of lawyers in briefs are not evidence, do not count, and are given no weight."). Moreover, based on the docket, a lot of the heavy lifting regarding the settlement conference had already been done. [Dkt. #91 (noting "review of the parties extensive settlement letters which requires review of some 90 pages of exhibits from the defendant and 320 pages from the plaintiff," "massive difference between the amount demanded by

the plaintiff and the amount offered by the defendant," and ordering the parties to have further discussions by the end of September 2023.); #97]. And, in any event, the parties' email exchanges from November 2nd through November 9th show that discovery matters had not, as the Lester Defendants suggest, been set aside. [Dkt. #107-2, at Page 379-82/526]. So, again, the Lester Defendants' assertion of "good cause" is flimsy at best, and ultimately unconvincing when piled on top of their blame deflections, exaggerations, and mischaracterizations. And, again, the plaintiff's motion to compel as to the remaining document requests is granted.

Here's the thing. Courts have broad discretion in resolving discovery disputes. *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998); *Equal Emp. Opportunity Comm'n v. Wal-Mart Stores E., L.P.*, 46 F.4th 587, 601 (7th Cir. 2022). As such, there are rarely "right" or "wrong" answers. *Compare United States v. Boyd*, 55 F.3d 239 (7th Cir. 1995) with *United States v. Williams*, 81 F.3d 1434 (7th Cir. 1996). Indeed, on a virtually identical set of facts, two decision-makers can arrive at opposite conclusions, both of which can constitute appropriate exercises of discretion and both be affirmed on appeal. *See Mejia v. Cook County, Ill.*, 650 F.3d 631, 635 (7th Cir. 2011); *United States v. Banks*, 546 F.3d 507, 508 (7th Cir. 2008). *Cf. United States v. Bullion*, 466 F.3d 574, 577 (7th Cir. 2006)(Posner, J.)("The striking of a balance of uncertainties can rarely be deemed unreasonable...."). Thus, there is a lot of "wiggle room" in ruling on discovery matters. So, if a party is hoping to convince a court to exercise its discretion in its favor, it probably should not do the following: file its amended response brief a day late without asking leave of court to do so; blame its opponent for not repeatedly dunning them for its discovery responses; blame the court for not setting deadlines that are already set in the Federal Rules of Civil Procedure; mischaracterize email (or other) exchanges, or make unfounded assumptions that it is off the hook for discovery because it is

9

purportedly too busy with something else. When a party responds to a discovery motion in such a fashion, it probably should "[]not expect favorable treatment on matters of discretion." *Campbell v. Clarke*, 481 F.3d 967, 969 (7th Cir. 2007).

Aside from that, a couple of brief observations regarding the Lester Defendants' objections seem worthwhile. Essentially, the Lester Defendants contend that the plaintiff's requests are overbroad and they ask for too much. But it's not surprising that the defendants are probably going to be required to produce a lot of discovery, because of how they set of up the Hardee's franchise deal. The defendants claim the deal was "relative[ly] straightforward[]" [Dkt. #113, at 1], but it seems to have been anything but. Based on the plaintiff's allegations, what ought to have been a fairly simple purchase transaction involving two entities with a purchase and a leaseback instead involved four entities, six persons – all allegedly related in some fashion – and three or four transactions as well as a substitution of the lessee first to one entity and then back to the original entity – on the defendants' side of the deal alone. It was the defendants' choice to structure the deal with multiple transactions and multiple participants. The more transactions, generally the more discovery. Likewise, the more participants, generally the more discovery. There is nothing magical or surprising in these conclusions.

Moreover, this is a case, for now, about RICO and RICO conspiracy. That means interrelations and communications between the defendants and the affiliates can be important. Patterns of activity – other transactions and leases – can be important. [Dkt. #93, at 5-6, 6-7]. And, finally, as Judge Alonso said in his Opinion on the defendants' motion to dismiss, "[p]laintiff will need to put more meat on the bones of the allegations as the case proceeds. . . . Whether plaintiff can develop evidence to prove its RICO allegations against Lester and the other defendants is, of course,

another story." [Dkt. #93, at 6, 7]. Discovery is the process by which the plaintiff and the defendant can unearth information relevant to their respective claims. It bears repeating, however, that discovery has its own inherent limitations which are not to be ignored. And it should not be forgotten that as the late (and indisputably great) Judge Moran put it, "[p]arties are entitled to a reasonable opportunity to investigate the facts-and no more." *Vakharia v. Swedish Covenant Hosp.*, 1994 WL 75055, at *2 (N.D. Ill. 1994).

Accordingly, the plaintiff's motion to compel [Dkt. #107] is granted, and the Lester Defendants are ordered to provide complete responses to the outstanding requests by February 1, 2024. Counsel are reminded that under the present schedule, fact discovery is to end on March 19, 2024. [Dkt. #110]. Given the requests in the plaintiff's motion, there is no occasion to examine *Rickels v. City of South Bend, Indiana*, 33 F.3d 785, 786-87 (7th Cir. 1994).

ENTERED:_____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 1/17/24

11